# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF ILLINOIS
### PEORIA DIVISION

CUMULUS RADIO CORPORATION f/k/a
CITADEL BROADCASTING CO.,      )
                                   )
     Plaintiff,            )
                                   )     Case No.  15-cv-1067
       v.              )
                                   )
JOSEPH OLSON and ALPHA MEDIA   )
LLC,                                 )
     Defendants.        )

# O R D E R  &  O P I N I O N

This matter is before the Court on Plaintiff's Motion for a Temporary Restraining Order ("TRO") (Doc. 3). Plaintiff filed a Verified Complaint and moved for a TRO on February 9, 2015. (Docs. 1, 3). The Court received written submissions from all parties and heard oral argument on February 12, 2015. For the reasons explained below, Plaintiff's Motion is granted in part and denied in part.

## BACKGROUND

Plaintiff Cumulus Radio Corporation owns and operates a number of radio stations in the Peoria, Illinois area. (Compl., Doc. 1, at ¶ 15). These stations generate revenue by selling advertising for radio time and advertising through online and social media. (*Id.* at ¶ 16). Plaintiff offered to hire Defendant Joseph Olson as an account executive on March 23, 2013, effective April 1, 2013. (*Id.* at ¶ 28). As an account executive, Olson was "expected to network to identify potential customers, service and maintain relationships with current customers, sell

advertising time to local and national customers, and obtain sales quotas." (*Id.* at ¶ 29). Olson received a number of benefits as part of his employment. These include a subsidized compensation plan; sales training; access to pre-existing customers to develop and maintain; networking opportunities with Business Networking International, the Senior Care Network, and the local Chamber of Commerce; funds for customer development; and access to a country club and local entertainment so he could host prospective customers. (*Id.*at ¶ 30.)

As part of Olson's employment, he entered into an employment agreement that included a number of post-employment restrictions. (*Id.* at ¶ 31; Doc. 1-2 at 1). In exchange for "consideration of Employee's employment by the Company, and other valuable consideration," Olson agreed to, among other things, not compete with Plaintiff, not solicit Plaintiff's customers, and not disclose Plaintiff's confidential information. (Doc. 1-2 at 1, 2-3).

Olson agreed not to compete with Plaintiff within a 60-mile radius of Plaintiff's Peoria sales office for six months following the termination of his employment (Compl. ¶ 31). The agreement defines competing as engaging "in any activities the same or essentially the same as Employee's Job Duties for any Competing Business." (*Id.*). A Competing Business is "any person . . . or entity carrying on a business that is the same or essentially the same as" Plaintiff's. (Doc. 1-2 at 2). It includes "all commercial media outlets that sell advertising, such as radio stations, television stations, cable operators, newspapers, magazines, Internet radio, advertising and publications, outdoor advertising and billboards, and advertising agencies." (*Id.*).

Olson also agreed to not solicit Plaintiff's customers for 12 months following the end of his employment. (*Id.* at 3). The agreement prohibits him from soliciting any customer of Plaintiff's whom he "had Contact on the Company's behalf" during his employment. (*Id.*). Contact means any interaction that Olson had with a customer that "took place in an effort to establish or further the business relationship between" Plaintiff and the customer. (*Id.*).

Finally, the agreement prohibited Olson from disclosing its confidential information for 12 months following the end of his employment. (*Id.* at 2). It defines confidential information as all information that Plaintiff "endeavors to keep secret" and "has commercial value to" Plaintiff "or is of such a nature that its unauthorized disclosure would be detrimental to" Plaintiff's interests. (*Id.*). Information that is otherwise in the public domain, or is known to employees from sources other than Plaintiff is not confidential under the agreement. (*Id.*).

Both the covenant not to compete and the covenant not to solicit customers include language that tolls the non-compete and non-solicitation time periods during the pendency of litigation to enforce the provisions. (Compl. ¶ 31). There does not appear to be a similar tolling provision related to Olson's obligation to not disclose confidential information. (*See id.*).

Olson voluntarily ended his employment on January 7, 2015, approximately 21 months after it began. (Compl. at ¶ 41). Olson began working with Defendant Alpha as an account executive two days later, on January 9, 2015. (*Id.* at ¶ 44). Alpha owns and operates a number of radio stations in Peoria, which Plaintiff

alleges directly compete with Plaintiff's stations. (*Id.* at ¶ 45). Olson now works less than one mile away from Plaintiff's office. (*Id.* at ¶ 46).

Alpha was aware of Olson's contract with Plaintiff, but hired him, anyway. (*Id.* at ¶ 47). Once at Alpha, Olson allegedly began soliciting customers of Plaintiff's with whom he'd had contact. (*Id.*at ¶ 48). This includes Taxes Now, a company that Olson had serviced while employed with Plaintiff, and Synergy Healthcare, one of Plaintiff's potential clients. (*Id.* at ¶¶ 49-50).

## STANDARD OF REVIEW

Federal Rule of Civil Procedure 65 permits a court to grant a temporary restraining order when a Plaintiff has demonstrated through specific facts in an affidavit or a verified complaint that they will suffer "immediate and irreparable injury, loss, or damage." Fed. R. Civ. P. 65(b)(1)(A). A party seeking to obtain a temporary restraining order must demonstrate (1) that its case has some likelihood of success on the merits; (2) that no adequate remedy at law exists; and (3) that it will suffer irreparable harm if the injunction is not granted. *Caterpillar Inc. v. Walt Disney Co.*, 287 F. Supp. 2d 913, 916 (C.D. Ill. 2003). If Plaintiff meets those first three requirements, the Court balances the relative harms of the parties and the public. *Ty, Inc. v. Jones Group*, 237 F.3d 891, 895 (7th Cir. 2001). The court weighs all factors using a sliding-scale approach. *Abbott Labs v. Mead Johnson & Co.*, 971 F.2d 6, 12 (7th Cir. 1992).

## DISCUSSION

Plaintiff seeks a temporary restraining order that would grant four separate types of injunctive relief. First, it seeks to enjoin Defendant Olson from working,

either directly or indirectly, in media sales for Defendant Alpha or any other direct competitor of Plaintiff, within a 60 mile area, for a period of 6 months following the entry of a TRO. Second, it seeks to enjoin Defendant Olson from soliciting, either directly or indirectly, any customers of Plaintiff's he contacted on behalf of Plaintiff during his employment at Plaintiff for a period of 12 months following the entry of a TRO. Third, it seeks to enjoy Defendant Olson from disclosing Plaintiff's confidential information for 12 months following the entry of a TRO. Fourth it seeks to enjoin both Defendants from using or disclosing Plaintiff's trade secret information.

In support of its motion, Plaintiff briefed its likelihood of success on the merits for each of the three counts alleged in the Complaint: breach of contract, tortious interference with a contract, and misappropriation of trade secrets. The Court need not consider Plaintiff's likelihood of success on its tortious interference claim at this stage, as it is not asking for any injunctive relief with respect to that claim and is only asking for relief with respect to its breach of contract claim against Olson and its misappropriation of trade secrets claim against Olson and Alpha. Therefore, the Court will consider whether Plaintiff has met its burden with respect to both of those claims.

## I. Likelihood of Success on the Merit

### a. Breach of Contract

The parties do not dispute that Olson has taken certain actions that are contrary to the agreement that he made. However, they dispute whether the contract was enforceable. "Under Illinois law, post-employment restrictive

covenants are only enforceable if they are reasonable in geographic and temporal scope and necessary to protect an employer's legitimate business interest." *Prairie Rheumatology Assocs. v. Francis*, 2014 IL App. (3d) 140338, -- N.E.3d ---, *3 (Ill. App. Ct. Dec. 11, 2014). However, courts must make two determinations before reviewing the reasonableness of a restrictive covenant: first, whether it is "ancillary to either a valid transaction or a valid relationship," and second, "whether there is adequate consideration to support the covenant." *Id.* (citing *Lawrence & Allen, Inc. v. Cambridge Human Resource Inc.*, 685 N.E.2d 434 (Ill. App. Ct. 1997)).

Defendants argue that Olson's contract with Plaintiff is unenforceable because it was not supported by adequate consideration. Specifically, they argue that Olson's contract was only supported by the promise of at-will employment, and Olson's employment with Plaintiff for 21 months was not lengthy enough to serve as consideration. Plaintiff argues that 21 months of employment is sufficient to serve as adequate consideration in this particular case because of the relative unobtrusiveness of the restrictive covenant and the fact that Olson resigned voluntarily. Further, it argues that Olson's agreement to enter into the restrictive covenant was supported by additional consideration beyond his at-will employment. Defendants dispute that there was additional bargained for consideration beyond Olson's employment.

### 1. Adequacy of Consideration

The parties do not dispute that Olson's contract with Plaintiff was ancillary to his employment. Therefore, the Court must first consider whether Plaintiff provided Olson with adequate consideration for his contractual promises.

The fact that the Court must consider the adequacy of consideration here is a departure from the usual rule in Illinois, in which courts merely assess the presence of consideration but do not assess its adequacy. *See Brown & Brown, Inc. v. Mudron*, 887 N.E.2d 437, 440 (Ill. App. Ct. 2008) (citing *Curtis 1000, INc. v. Suess*, 24 F.3d 941, 945-46 (7th Cir. 1994). In this context, courts depart because they recognize that "a promise of continued employment may be an illusory benefit when the employment is at will." *See id.* For that reason, Illinois courts, including the Illinois Supreme Court, have required that consideration based upon employment continue for a "substantial" period of time. *See Melena v. Anheuser-Busch, Inc.*, 847 N.E.2d 99, 109 (Ill. 2006).

How much time constitutes a "substantial" period of time is currently unclear as a matter of Illinois law. As a rule of thumb, Illinois appellate courts have suggested that at-will employment for two years can serve as adequate consideration. *See, e.g., Brown & Brown v. Mudron*, 887 N.E.2d 437, 440 (Ill. App. Ct. 2008) ("Illinois courts have generally held that two years or more of continued employment constitutes adequate consideration."). Two recent Illinois appellate courts, however, have suggested that this two-year rule of thumb might, in fact, be a bright-line rule in which at-will employment can only serve as adequate consideration if an employee has worked with the employer for at least two years.

*See Fifield v. Premier Dealer Servs., Inc.*, 993 N.E.2d 938, 943 (Ill. App. Ct. 2013); *Prairie Rheumatology Assoc.*, 2014 IL App. (3d) 140338 at *4. The Illinois Supreme Court has not addressed this question.

In the absence of a ruling from the Illinois Supreme Court, this Court "must make a predictive judgment as to how the supreme court of the state would decide the matter if it were presented presently to that tribunal." *Allstate Ins. Co. v. Menards, Inc.*, 285 F.3d 630, 635 (7th Cir. 2002). Since *Fifield*, three federal courts decisions have considered this very question. In *Montel Aetnastak, Inc. v. Miessen*, 998 F. Supp. 2d 694 (N.D. Ill. 2014), Judge Castillo, sitting in the Northern District, rejected the bright-line rule from *Fifield,* and held that fifteen months of employment constituted adequate consideration for a restrictive covenant. *Id.* at 715-18. Just last week, in *Bankers Life and Casualty Co. v. Miller*, 14-cv-3165, 2015 WL 515965 (N.D. Ill. Feb. 6, 2015), Judge Shah, also of the Northern District, predicted that "[t]he Illinois Supreme Court would . . .reject a rigid approach to determining whether a restrictive covenant was supported by adequate consideration" and "not adopt a bright-line rule requiring continued employment for at least two years in all cases." *Id.* at *4. However, in *Instant Technology, LLC v. DeFazio*, 12 C 491, 2014 WL 1759184, -- F. Supp. 2d --- (N.D. Ill. May 2, 2014), Judge Holderman, also of the Northern District, predicted that the Illinois Supreme Court would apply the bright-line rule announced in *Fifield*. *Id.*at *14.

As discussed below, the Court does not believe that the Illinois Supreme Court would adopt the bright-line test announced in *Fifield*. Such a rule is overprotective of employees, and risks making post-employment restrictive

covenants illusory for employers subject completely to the whimsy of the employee as to the length of his employment. A case-by-case, fact-specific determination, on the other hand, can ensure that employees and employers alike are protected from the risks inherent in basing consideration on something as potentially fleeting as at-will employment

## A. The *Fifield* Approach

In *Fifield*, an insurance salesperson signed an employment agreement with Premier Dealer Services, an insurance administrator that markets finance and insurance products to the automotive industry. The agreement required the employee to not compete with PDS for a period of two years after the termination of his employment. 99. N.E.2d at 939. After negotiation with the employee, the employer added a provision "which stated that the nonsolicitation and noncompetition provisions would not apply if the employee was terminated without cause during the first year of his employment." *Id.* at 940. The employee voluntarily ended his employment with the employer a little more than three months after he started, and immediately began working for a competitor. *Id.*

In *Fifield,* the Court held that the post-employment restrictive covenant was not enforceable because it was not supported by adequate consideration. *See id.* at 943-44. It reasoned that "Illinois courts have repeatedly held that there must be at least two years or more of continued employment to constitute adequate consideration in support of a restrictive covenant." *Id.* at 943. The employee worked for less than four months, which is less than two years. Therefore the consideration was inadequate. *See id.*

A recent case from the Illinois Appellate Court for the Third District applied *Fifield*, suggesting it has some staying power. In *Prairie Rheumatology Associates*, a medical practice sued a doctor who was a former employee, seeking to enforce a restrictive covenant keeping her from taking its current patients. The appellate court held that the restrictive covenant was not enforceable because of a failure of consideration. 2014 IL App (3d) 140339 at *4. First, the Court considered the duration of the doctor's employment with the practice. It concluded that because she left the practice after being employed for 19 months, the time period was not substantial enough to serve as consideration. *See id.* It relied upon "the general 2-year rule of thumb that supports adequate consideration." *Id.* (citing *Fifield*, 993 N.E.2d 93).

However, the *Prairie Rheumatology Associates* court departed from *Fifield* in that it considered whether there was additional consideration beyond actual employment. Therefore, it examined whether the medical practice helped the doctor build her practice by (1) providing her with assistance in obtaining hospital credentials, (2) helping pay her hospital dues, and (3) introducing her to patients and referral sources. *Id.* The doctor's employment contract included terms requiring the medical practice to provide these benefits, but the Court concluded that it in fact had not provided these benefits. *Id.*

This bright-line approach, even when modified to allow for the possibility of some additional consideration, suffers from a number of analytical problems that make it unsatisfying. One of the primary problems from which it suffers is its failure to give weight to the reason that an employee's at-will employment ended. In

*Fifield*, the employer argued that the case was not a good candidate for a bright-line two-year rule because the employee voluntarily quit and was not fired or forced to resign. However, the court dismissed the argument, and concluded that the two-year rule "is maintained even if the employee resigns on his own instead of being terminated." 993 N.E.2d at 943.

This conclusion turns the logic behind considering the adequacy of consideration on its head, and is also based upon an unsatisfying analysis of prior case law. As the Seventh Circuit explained, at-will employment can only serve as consideration if it is for a substantial period of time because an employee could sign an onerous post-employment restrictive covenant only to be terminated a short time later. *See Curtis 1000, Inc. v. Suess*, 24 F.3d 941, 946 (7th Cir. 1994). Therefore, courts have imposed this requirement to protect employees from the potential whim of their employers. By requiring at least two years of employment and rendering post-employment restrictive covenants void if an employee leaves at any time before two years, even if they did so on their own volition, the *Fifield* court flips this problem on its head. Under this rule, "an employee can void the consideration for any restrictive covenant by simply quitting for any reason." This creates a reality that "renders all restrictive covenants illusory in [Illinois]," as "[t]hey would be voidable at the whim of the employee." *Brown & Brown*, 887 N.E.2d at 442 (Schmidt, J., dissenting). *See also LKQ Corp. v. Thrasher*, 785 F. Supp. 2d 737, 744 (N.D. Ill. 2011)(concluding that twelve-months of at-will employment served as adequate consideration for a restrictive covenant when employee resigned voluntarily).

Moreover, the *Fifield* court's conclusion that a bright-line rule applies even when the employee voluntarily terminates employment only finds weak support in prior Illinois case law. The *Fifield* court relied upon two other Illinois appellate court cases to support this proposition: *Diederich Insurance Agency, LLC v. Smith*, 952 N.E.2d 165 (Ill. App. Ct. 2011) and *Brown & Brown*, 887 N.E.2d 437. In both cases, employees ended employment before the two-year mark and the courts held that the consideration was inadequate in spite of the fact that the employees resigned voluntarily. Both cases contain near-identical language, which is devoid of analysis: "The fact that [the employee] resigned does not change our analysis." *Brown & Brown*, 887 N.E.2d at 441; *Diederich Ins. Agency, LLC*, 952 N.E.2d at 169.

To reach this conclusion, the *Brown & Brown* and *Diederich Insurance Agency* courts relied upon *Mid-Town Petroleum, Inc. v. Gowen*, 611 N.E.2d 1221 (Ill. App. Ct. 1993), a case that cannot support such a broad proposition. The *Mid-Town Petroleum* court held that a post-employment restrictive covenant was not supported by adequate consideration when an employee who had been with an employer for fifteen years signed a restrictive covenant in order to receive a promotion and resigned eight months later. There, the employee did not sign a post-employment restrictive covenant "until the sales manager position was offered and agreement reached as to the description of the sales manager position." *Id.* at 1226. One of the terms in the description of the sales manager position was that the employee would report directly to the CEO. *Id.* Shortly before the employee resigned, his job description changed and he was told he would no longer report to the CEO. *Id.* The trial court concluded that it sounded to him "like the oral

agreement to promote [the employee] was combined with and based on consideration that he sign the employment contract." *Id.* Therefore, the facts of *Mid-Town Petroleum* suggests that the reasons a person resigns are pertinent to determining whether consideration is adequate. In that case, an employee resigned seven months after signing a post-employment restrictive covenant because the employer changed his job in a way that he thought was material, as his assent to the restrictive covenant was dependent upon the terms of his job. *See id.*

## B. A Fact-Specific Approach

Other courts have criticized a bright-line approach as too rigid, and instead suggested that the Illinois Supreme Court would consider a variety of facts in assessing the adequacy of consideration. *See Bankers Life & Casualty. Co.*,2015 WL 515965 at \*4. In *Bankers Life*, Judge Shah predicted that the Illinois Supreme Court would apply a flexible standard, especially in light of its recent holding in *Reliable Fire Equip. Co. v. Arredendo*, 965 N.E.2d 393 (Ill. 2011). In *Reliable Fire Equipment*, the Illinois Supreme Court considered whether a post-employment restrictive covenant was reasonable in its scope. *Id.*at 404. It did not have the occasion to consider the adequacy of consideration. With respect to the reasonableness of a covenant, it explained, "[w]hether a legitimate business interest exists is based on the totality of the facts and circumstances of the individual case." *Id.* The court issued this opinion as a corrective to appellate court's "rigid and preclusive" test of reasonableness. *Id.*

It is reasonable to assume that the Illinois Supreme Court would continue to employ this logic when assessing the issue of consideration. Federal courts applying

such a flexible standard have considered factors such as an employee's length of employment coupled with the terms on which they left their employer. *See Montel Aetnastak, Inc.*, 998 F. Supp. 2d at 716.

### C. Application

In this case, it is undisputed that Olson worked for Plaintiff for twenty-one months, and it is undisputed that Olson resigned voluntarily. (*See* Answer, Doc. 10, at 1, 6). On this basis alone, the Court concludes that the post-employment restrictive covenants were supported by adequate consideration. *See Montel Aetnastak, Inc.*, 998 F. Supp. 2d at 716. Olson worked for Plaintiff for nearly two-years, resigning just before the contract would have been supported by adequate consideration under *Fifield's* bright-line rule. Applying the bright-line rule would turn a judicially-crafted requirement for adequate consideration that is meant to shield employees into a sword that can potentially harm employers' legitimate business interests, which lack a comparable shield of protection. Because the Court reaches its decision on this basis, it need not consider whether Olson's contract was supported by additional consideration such as compensation, training, and client entertainment benefits.

### 2. Reasonableness of Terms

Having concluded that Olson's contract was supported by adequate consideration, the Court must consider whether the restrictive covenants included in the contract are reasonable. There are four basic components to the reasonableness inquiry: (1) the restrictive covenant must protect a legitimate business interest of the employer-promisee, (2) the restrictive covenant cannot

impose undue hardships on the employee-promisor, (3) the restrictive covenant cannot be injurious to the public, and (4) time and territory limits must be reasonable. *Reliable Fire Equip. Co.*, 965 N.E.2d at 396. During the hearing, Defendants did not challenge the reasonableness of the restrictive covenants included in Plaintiff's contract with Olson. The Court concludes that Plaintiff has demonstrated a likelihood of success that it can demonstrate that the terms of its restrictive covenant were reasonable.

## A. Legitimate Business Interest

The Court must first consider whether a legitimate business interest exists. "Whether a legitimate business interest exists is based on the totality of the facts and circumstances of the individual case. Factors to be considered in this analysis include, but are not limited to, the near-permanence of customer relationships, the employee's acquisition of confidential information through his employment, and time and place restrictions." *Id.* at 403. Plaintiff has alleged that it has a business interest in the near permanence of its customers.

In assessing whether customer relationships are "near permanent" courts consider a number of factors. These include (1) the number of years required to develop clientele, (2) the amount of money invested to acquire clients, (3) the degree of difficulty in acquiring clients, (4) the extent of personal customer contacts by the employee, (5) the extent of the employer's knowledge of its clients, (6) the duration of the customers' activities with the employer, and (7) the intent to retain employer-customer relations." *See A-Tech Computer Srvs., Inc. v. Soo Hoo*, 627 N.E.2d 21, 26 (Ill. App. 1993)(quoting *McRand v. Van Beelen*, 486 N.E.2d 1306 (Ill. App. 1985).

Plaintiff has alleged that it spends considerable amounts of money to attract and retain customers, and that it invests time and money in training account executives. (Compl. at ¶¶ 18-19). In its motion for a TRO, Plaintiff argued that it has long-standing relationships with customers (Doc. 3 at 17), and during the hearing Plaintiff again emphasized that its customers have limited budgets for advertising and chose to advertise on the basis of their relationships. Again, during the hearing, Defendant did not challenge this element.

At this stage, prior to discovery, the Court concludes that Plaintiff has demonstrated a likelihood of succeeding on the basis of its protectable interest in its customers. A previous Illinois case held that radio stations have a protectable interest in the near permanence of their customers. *See Midwest Television, Inc. v. Oloffson*, 699 N.E.2d 230 (Ill. App. Ct. 1998). In *Midwest Television*, a radio station sought to enforce a restrictive covenant against one of its on-air hosts. As part of the opinion, the court discussed the nature of the station's relationship with its advertisers. It observed that "[r]adio broadcasting is highly competitive and requires extensive efforts by stations seeking to acquire listeners and advertisers." *Id.* at 233. It found that customer relationships can take more than a year to develop, that the radio station customized its approach for each potential customer, and that it continuously pursued knowledge about its customers. *Id.* at 233-34. Additionally, the radio station showed that "60% of [one account executive's] advertising accounts were long-term customers, some for over 10 years." *Id.* at 234.

The Court is skeptical that Plaintiff will be able to demonstrate a protectable interest in its proprietary and confidential information. During the hearing, the

parties disagreed over whether the information that Plaintiff is seeking to protect is publicly available. Defendants argue that information relating to Plaintiff's pricing is readily available, as Plaintiff's customers routinely share such information with Alpha and its account executives. (*See* Aff. of Michael Wild, Doc. 9 at 21 (noting that it is "very routine for [Alpha Media's] customers to provide us with information from Cumulus, since it often times charges less than Alpha Media does.")).However, for the purpose of the TRO, Plaintiff's likelihood of demonstrating that it has a legitimate business interest in its customers is sufficient to support the proposition that Plaintiff has some likelihood of succeeding on the merits.

## B. Reasonableness of Scope

Next, the Court must consider the reasonableness of the scope of the restrictive covenants. Plaintiff has demonstrated some likelihood of success on the issue that its restrictive covenants are reasonable in scope. During the hearing, Plaintiff argued that the 60-mile radius included in the covenant to not compete is necessary because it encompasses its market area, and it argued that the 6-month non-compete period is necessary to allow it to transition its current customers to a new account executive. The non-disclosure and non-solicitation are limited to one-year in length. The non-solicitation agreement is limited to customers with whom Olson had contact while employed by Plaintiff. *See McRand, Inc. v. van Beelen*, 486 N.E.2d 1306, 1315 (Ill. App. 1985) (explaining that non-solicitation agreements are reasonable only if they are limited to customers with whom former employees had conduct); *Unisource Worldwide, Inc. v. Carrara*, 244 F. Supp. 2d 977, 983 (C.D. Ill. 2003) (finding that one non-solicitation covenant was reasonable because it was

limited to the customers with which an employee had worked, while another non-solicitation covenant was unreasonable because it included customers with whom an employee had never worked). Finally, during the hearing, Defendants asserted that they are not in violation of the covenant restricting disclosure of information.

For all of the reasons, the Court concludes that Plaintiff has some likelihood of success in demonstrating that the covenants are reasonable in scope, do not overly restrict Defendant Olson, and not likely to injure the public. Because the Court has concluded that the restrictive covenants are supported by adequate consideration, it concludes that Plaintiff is likely to succeed on the merits of its breach of contract claim.

### b. Illinois Trade Secrets Act

The Court is unable to conclude that Plaintiff has some likelihood of success with respect to its Illinois Trade Secrets Act claim. Under the ITSA, a person is entitled to recover damage for the misappropriation of trade secrets. 765 Ill. Comp. Stat. 1065/4. To establish a violation, a plaintiff must show that (1) a trade secret existed; (2) it was misappropriated through improper acquisition, disclosure, or use; and (3) the misappropriation damaged the trade secret's owner. *First Financial Bank, N.A. v. Bauknecht*, 12-cv-1509, 2014 WL 5421241, -- F. Supp. 3d. --, *12 (C.D. Ill. Oct. 23, 2014).

The first thing a plaintiff must do is establish that information is a trade secret. A trade secret is information that "is sufficiently secret to derive economic value, actual or potential, from not being generally known to other person who can

obtain economic value from its disclosure or use" and "is the subject of efforts that are reasonable under the circumstances to maintain its secrecy or confidentiality." 765 Ill. Comp. Stat. 1065/2(d).

Plaintiff claims that it has a trade secret in its "rates, price and discount arrangements . . . ,information concerning sponsors'/customers' particular needs, preferences and interests . . . ., marketing plans, business strategies, promotion plans, financial information, forecasts, and personnel information." (Doc. 3 at 20). It claims that it protects this information by requiring its employees to sign non-disclosure agreements and also by only giving employees information on a need-to-know basis. (Compl. at ¶ 38).

The Court concludes that Plaintiff is unlikely to succeed on the merits of its ITSA claim because it has not demonstrated that it has taken sufficient efforts to maintain the information's secrecy or confidentiality. The manner in which an employer maintains alleged trade secrets' confidentiality is the most important factor in determining whether a trade secret exists. *First Fin. Bank*, 2014 WL5421241, at *15. Although nondisclosure agreements provide evidence that an employer has taken adequate steps, they are not sufficient to demonstrate that an employer has taken reasonable steps. *Id.* In *First Financial Bank*, this Court found that certain evidence, such as evidence that employees needed security codes to access the computer systems where confidential information was held, were pertinent to showing that trade secret information was kept reasonably secure. *Id.*at *16. Here, however, Plaintiff only points to nondisclosure agreements and other general precautions. Olson argues, however, that the information was not

kept secret. In an affidavit, he states that he "kept customer information in folders on the top of [his] desk," which were "accessible to anyone in the building including other employees and even custodians." Further, he states that this information was readily accessible "on a shared computer network" that "could be reviewed by anyone who had access to the computer system." (Aff. of Joseph Olson, Doc. 9 at 18).

For these reasons, the Court has serious doubts that Plaintiff will be able to succeed on its ITSA claims.

## II. Inadequacy of Relief at Law

Plaintiff has demonstrated that it has inadequate relief at law. Defendants argue that Plaintiff's contract provides it with the option of seeking money damages. (Doc. 9 at 2). However, money damages are not adequate in this context. As the Seventh Circuit explained in *Hess Newmark Owens Wolf, Inc. v. Owens*, 415 F.3d 630 (7th Cir. 2005), concrete injury such as lost accounts can be properly remedied by money damages. *Id.* at 632. However, it went on to note that "[c]competition changes probabilities," a fact that makes it difficult for businesses to easily "identify which contracts slipped from its grasp." *Id.* at 633. In such a circumstance, money damages cannot provide a necessary remedy. The Court concludes that Plaintiff does not have an adequate remedy at law.

## III.    Possibility of Irreparable Harm

Plaintiff has also demonstrated the possibility of irreparable harm, as it has shown that it risks losing business to Alpha if Olson is permitted to breach his

contract. "Under Illinois law, irreparable harm has been presumed in cases where a former insider lures customers away through a competing businesses." *Jano Justice Sys., Inc. v. Burton*, 636 F. Supp. 2d 763, 767 (C.D. Ill. 2009). In order to demonstrate irreparable harm, a Plaintiff need not demonstrate concrete harm or specific injuries such as lost business. *Owens*, 415 F.3d at 362. Rather, "it is precisely the difficulty of pining down what business has been or will be lost that makes an injury 'irreparable'." *Id.*

IV. **Balance of Harm**

Last, the Court must consider the balance of harms. As explained above, the court weighs all factors using a sliding-scale approach. *Abbott Labs,* 971 F.2d at 12. In cases in which a plaintiff has demonstrated a higher likelihood of succeeding on the merits, "the less the balance of irreparable harms need weigh towards its side," and the less the court need to consider consequences to the public interest. *Id.*

Plaintiff has demonstrated a high likelihood of success on its breach of contract claim, and it is the Court's judgment that the balance of the equities lean toward granting Plaintiff's Motion for a TRO with respect to the relief it seeks that relates to that claim.

It is true that granting Plaintiff's temporary restraining order will have unpleasant consequences for both Defendants. If the Court enjoins Olson from working for Alpha, Olson will be deprived of his current job and Alpha will be deprived of the efforts of a successful salesperson who made nearly a quarter-million dollars in sales last year. (*See* Compl. at ¶ 35). However, as Plaintiff notes,

an injunction will "require Olson to abide by the terms of the Agreement he voluntarily executed." (Doc. 3 at 23). This leaves Olson with other local employment opportunities and also permits Olson to seek employment in the same industry outside of the 60-mile radius contained in the agreement. Although this is disruptive, the Court concludes that the balance of harm tilts in favor of Plaintiff, which loses the benefits of a potentially enforceable contract and also suffers from the uncertainty of lost business that it could have otherwise retained had Olson abided by the terms of his agreement.

The Court concludes that it need not enjoin Olson or Alpha from using or disclosing Cumulus' trade secret information. As discussed above, in the Court's estimation, Plaintiff has demonstrated a low likelihood of succeeding on its ITSA claim. Furthermore, an injunction with respect to the breach of contract claim is likely to cure much of the irreparable harm that Plaintiff could suffer. Therefore, an injunction with respect to the ITSA claim is unnecessary.

## V. Bond

Under Rule 65, a Court may not issue a temporary restraining order unless the movant "gives security in an amount that the court considers proper to pay the costs and damage sustained by any party found to have been wrongfully enjoined or restrained." Fed. R. Civ. P. 65(c). An injunction in this case may cost Olson "commissions while it is in force" and may curtail his "future earnings by eroding [his] reputation and good will in the industry." *See Equip. & Sys. for Industry, Inc. v. Zevetchin*, 864 F. Supp. 253, 258 (D. Mass. 1994). Similarly, Alpha will lose the

benefit of a successful account executive. Therefore, the Court concludes that Plaintiff must post as security an amount that is beyond a nominal bond. Taking all of the relevant factors into consideration, the Court will order Plaintiff to post as security a surety bond in the amount of $25,000.

## CONCLUSION

For the foregoing reasons, Plaintiff's Motion for a Temporary Restraining Order is GRANTED in PART.

1. Defendant Olson is enjoined from working, either directly or indirectly, in media sales for Defendant Alpha or any other direct competitor of Cumulus, within a 60 mile area, for a period of 6 months following the entry of this order;

2. Defendant Olson is enjoined from soliciting, either directly or indirectly, any customers of Cumulus he contacted on behalf of Cumulus during his employment at Cumulus for a period of 12 months following the entry of this order; and

3. Defendant Olson is enjoined from using or disclosing Cumulus' confidential information for 12 months from January 7, 2014.

Plaintiff is required to post security of $25,000 in the form of a surety bond.

This matter SET for a status conference by telephone on Tuesday, February 17 at 11:00 AM. The Court will place the call. The parties should be prepared to establish a plan for expedited discovery.

Entered this 13th day of February, 2015.

_____
s/Joe B. McDade
JOE BILLY McDADE
United States Senior District Judge