# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF ILLINOIS
## PEORIA DIVISION

| | | |
|---|---|---|
| CUMULUS RADIO CORPORATION f/k/a) | | |
| CITADEL BROADCASTING CO., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No.   15-cv-1067 |
| v. | ) | |
| | ) | |
| JOSEPH OLSON, | ) | |
| | ) | |
| Defendants. | ) | |

# O R D E R  &  O P I N I O N

This matter is before the Court on Plaintiff Cumulus Radio Corporation's Motion for Attorneys' Fees and Costs. (Doc. 72).  The motion is fully briefed and is ready for decision.

## FACTUAL AND PROCEDURAL BACKGROUND

On February 9, 2015, Plaintiff Cumulus Radio Corporation filed a three-count Verified Complaint against Joseph Olson and his employer, Alpha Media, LLC. (Doc. 1). The Complaint alleged that Olson breached non-compete, non-solicitation, and confidentiality covenants included in his employment agreement with Cumulus (who was his former employer) when he quit and began to work for Alpha (Cumulus's competitor in the Peoria, Illinois radio market). Cumulus further alleged that Alpha tortiously interfered with its contract with Olson, and that Olson and Cumulus misappropriated its trade secrets.

On the same day, Plaintiff filed a Motion for a Temporary Restraining Order, in which it requested that the Court enjoin Olson from breaching the terms of his

employment agreement with Cumulus and enjoin Alpha and Olson from using or disclosing Cumulus's trade secret information. (Doc. 3). The Court heard oral argument on Plaintiff's motion on February 12, 2015, (Dkt. at 2/12/15 Minute Entry), and granted it with respect to the breach of contract claim on February 13, 2015. (Doc. 11). On February 18, 2015, the Court set a hearing for a preliminary injunction for March 13, 2015, which it consolidated with a trial on the merits. (Dkt. at 2/18/15 Minute Entry).

On February 26, 2015, Defendants filed their first of two motions to dismiss the case for lack of jurisdiction and dissolve the temporary restraining order. (Doc. 19). Plaintiff had invoked the Court's jurisdiction pursuant to 28 U.S.C. § 1332, and Defendants argued that certain non-diverse members of Alpha (a limited liability company) destroyed complete diversity. While that motion was pending, Cumulus, by stipulation, dismissed its Illinois Trade Secrets Act claim against both defendants on March 2, 2015. (Doc. 26).

On March 10, 2015, the Court denied Defendants' motion to dismiss. (Doc. 55). However, it acknowledged at the time that open questions remained about Alpha's members even after disposing of the first motion to dismiss. (*Id*. at 14-15). On March 11, 2015, one day later, Defendants filed a second motion to dismiss, and presented new evidence that Alpha and Cumulus were not completely diverse. (Doc. 58). On March 12, 2015, Plaintiff indicated to the Court that it wished to voluntarily dismiss Alpha Media (along with the tortious interference claim), and only proceed against Olson for breach of contract. (Dkt. at 3/12/2015 Minute Entry).

On March 13, 2015, the Court entered an order in which it dismissed the tortious interference claim without prejudice, with the parties to bear their own costs. (Doc. 66). It then held a one-day bench trial as to Plaintiff's breach of contract claim against Olson. (Dkt. at 3/13/2015 Minute Entry).

The Court ultimately concluded that Cumulus's employment agreement with Olson was enforceable and that Olson breached the non-solicitation and non-compete covenants. (Doc. 70). It enjoined Olson from working in sales and marketing for Defendant Alpha within 60 miles of Peoria, Illinois for a period of six months following the entry of the order, and further enjoined Olson from soliciting customers with whom he had contact on behalf of Cumulus during his employment at Cumulus on behalf of Alpha for a period of 12 months following the entry of the order. (Doc. 70 at 35).

Cumulus then filed the pending motion for fees and costs. It seeks $135,091 in fees and $3,622.45 in costs for a total of $138,713.45. (*See* Doc. 72 at 3; Doc. 77 at 3-4). This includes time for work done by attorneys Susan Benton and Courtney Adair, as well as paralegal Thomas Ligouri. (Doc. 72 at 6). It does not include costs or attorneys' fees incurred by Cumulus's local counsel. (*Id.* at 3, n.3).

DISCUSSION

## I. Entitlement to Attorneys' Fees

The parties agree that Cumulus's employment agreement with Olson is governed by Illinois law. Illinois "follows the 'American rule,' which prohibits prevailing parties from recovering their attorney fees from the losing party, absent express statutory or contractual provisions." *Sandholm v. Kuecker*, 962 N.E.2d 418,

435 (Ill. 2012). Contractual provisions providing for attorneys' fees are to be strictly construed. *Negro Nest, LLC v. Mid-Northern Mgmt., Inc.*, 839 N.E.2d 1083, 1085 (Ill. App. Ct. 2005).

Pursuant to Olson's agreement with Cumulus, he is required to "pay all costs, expenses, and/or charges, including reasonable attorneys' fees, incurred by [Cumulus] in enforcing any provisions [of the Agreement]." (Doc. 1-2 at 4). In this case, Cumulus successfully enforced two provisions of the agreement. Therefore, by the terms of the agreement, it is entitled to seek reasonable attorneys' fees and costs it incurred in pursuing its breach of contract claim.[1]

## II. Calculating Fees

Olson argues that in order to succeed on its motion, Plaintiff "must show more than a compilation of hours multiplied by a fixed hourly rate, or copies of the bills issued to the client . . . " (Doc. 75 at 2 (quoting *Mercado v. Calumet Fed. Savs. & Loan Ass'n*, 554 N.E.2d 305, 312 (Ill. App. Ct. 1190)). Additionally, Olson suggests, Plaintiff must "specify the services performed, by whom they were performed, the time expended thereon and the hourly rate charged therefore." (*Id.*).

However, "even in a diversity suit the requirements of proof are governed by federal rather than state law." *Taco Bell Corp. v. Cont'l Cas. Co.*, 388 F.3d 1069, 1076 (7th Cir. 2004). And, in the Seventh Circuit, courts do not submit fee requests based upon contractual fee-shifting provisions to the same degree of rigorous review

---

[1] Olson, without legal argument, requests that the Court find that attorneys' fee provision is unconscionable. By not developing this argument, Olson has waived it. *See United Vaccines, Inc. v. Diamond Animal Health, Inc.*, 409 F. Supp. 2d 1083, 1098 (W.D. Wisc. 2006)(citing *Central States, Se. and Sw. Areas Pension Fund v. Midwest Motor Express, Inc.*, 181 F.3d 799, 808 (7th Cir. 1999))(declining to address undeveloped argument regarding the enforceability of a contractual provision)).

as Illinois state courts. Instead, "[b]ecause fee-shifting occurs as a result of the parties' *ex ante* private ordering," the Seventh Circuit instructs that fees should be reimbursed "no matter how the bills are stated," and courts need not "engage in detailed, hour-by-hour review of a prevailing party's billing records." *See Johnson Controls, Inc. v. Edman Controls, Inc.*, 712 F.3d 1021, 1027 (7th Cir. 2013)(internal quotation marks omitted).

Rather, the Seventh Circuit "has read a 'reasonableness' requirement into contractual fee-shifting provisions." *Logan Knitting Mills, Inc. v. Matrix Grp. Ltd., Inc.*, No. 04 C 7596, 2007 WL 1594482, at *2 (N.D. Ill. June 1, 2007). "If counsel submit bills with the level of detail that paying clients find satisfactory, a federal court should not require more." *In re Synthroid Mkt'g Litig.*, 264 F.3d 712, 722 (7th Cir. 2001). Instead, it is proper for a court to consider "market mechanisms," including "bills that meet market standards in their detail." *Medcom Holding Co. v. Baxter Travenol Labs., Inc.*, 200 F.3d 518, 520 (7th Cir. 1999).

District courts then must review fee petitions submitted pursuant to a contractual fee-shifting provision to ensure that the fees "are not pie-in-the-sky numbers that one litigant seeks to collect from a stranger but would never dream of paying itself." *Id*. The best evidence of reasonableness in these circumstances is whether the party seeking fees was willing to pay them earlier. *Cintas Corp. v. Perry*, 517 F.3d 459, 469 (7th Cir. 2008); *Balcor Real Estate Holdings, Inc. v. Walentas-Phoenix Corp.*, 73 F.3d 150, 153 (7th Cir. 1996). This Court, however, must seek to guard against the moral hazard that a prevailing party "ran the meter" because they thought that the other party "would have to cover the tab."

*Balcor*, 73 F.3d at 153. Therefore, the inquiry cannot end with looking into whether there is proof of payment. Otherwise, "courts would be reading into contractual fee provisions a standard of 'prepayment' rather than 'reasonableness.'" *Logan Knitting Mills, Inc.*, 2007 WL 1594482, at *2. To do this, the Court should consider whether the aggregate amount of fees are reasonable compared to what's at stake and also by considering the opposing party's litigation strategy. *See Johnson Controls, Inc.*, 712 F.3d at 1027.

In support of its motion for fees, Plaintiff has submitted invoices for fees and costs that it received from its counsel. (Docs. 73-3, 73-4). In her declaration, Susan Benton, Plaintiff's lead counsel, states that she was "careful to remove any unnecessary, duplicative time entries and any entries related to the tortious interference claim against Alpha, the Illinois Trade Secret Act claim and the two motions to dismiss for lack of subject matter jurisdiction filed on behalf of Olson and Alpha." (Doc. 73 at 4). It is undisputed that Plaintiff actually paid these invoices.

Olson, however, argues that the invoices submitted by Plaintiff are insufficient to justify attorneys' fees for a number of reasons. First, he notes that Plaintiff's billing records are heavily redacted, and argues that the redactions make it difficult for both the Court and counsel to determine whether the entries relate to the breach of contract claim or determine whether they are reasonable. (Doc. 75 at 3). Next, he argues that the invoices submitted by Plaintiff contain block billing, which in certain instances also makes it difficult to determine whether work was either reasonable or related to the breach of contract claim. (*Id.*). Finally, Plaintiff argues that the invoices reflect unnecessary or excessive legal work. This includes

entries relating to Plaintiff's responses to discovery requests,[2] entries relating to the preparation of the Verified Complaint and the memorandum in support of Plaintiff's Motion for a Temporary Restraining Order,[3] and the depositions of two adverse witnesses. (*Id.* at 4-5).

In reply, Plaintiff suggests that Olson's parsing of its invoices is inappropriate in this situation, and would be more appropriate if it had moved for fees pursuant to a fee-shifting statute. (Doc. 77 at 1). Plaintiff also argues that it redacted its invoices to protect its attorney-client and work product privileges, and has offered to provide the Court with unredacted copies of its invoices for *in camera* review. (*Id.* at 2). Finally, it agreed to not seek fees for two entries – one that related to its dismissed tortious interference claim and another that related to discovery on the motion to dismiss. (*Id.* at 2-3).

Some of Olson's criticisms of Plaintiff's invoices are well-taken, even in the contractual fee-shifting circumstance. In its March 17, 2015 Order, this Court warned Plaintiff that it could only seek costs or fees associated with its breach of contract claim against Olson. Here, where Plaintiff originally brought three claims and is only entitled to attorneys' fees from one, it would be inappropriate if the Court failed to review submitted billing records to ensure that Plaintiff only sought fees for the breach of contract claim. Plaintiff argues that it does not seek any costs and fees associated solely with its tortious interference or ITSA claims, but that

---

[2] Olson asserts that only around 100 documents of the great volume that was produced had any relationship to Plaintiff's breach of contract claim.

[3] Olson notes that the Complaint contained three counts and that Plaintiff briefed all three counts as part of its motion for a TRO, but that Plaintiff is only entitled to attorneys' fees on the breach of contract count.

does not preclude the possibility that some of its attorneys' work was related to those claims. This is especially true at the outset of litigation, when both Benton and Adair dedicated significant time toward researching legal issues and drafting and revising the Verified Complaint and the memorandum in support of the motion for a TRO. The redactions and generalities throughout Plaintiff's invoices make it difficult at places to determine whether its attorneys' work was directed toward the breach of contract claim, directed toward other claims, or directed toward research and writing that was necessary to pursue all three claims.

However, Olson's concerns are overstated. Cumulus's breach of contract claim was the heart of its Verified Complaint and its motion for a temporary restraining order. And, unlike the other two claims, the breach of contract claim was mired in an unsettled area of Illinois law. The Court has no doubt that Plaintiff spent more time researching this area of law and developing a legal theory than it did researching the less legally-challenging ITSA claim and the ancillary tortious interference claim. This conclusion is supported by the fact that Plaintiff's twenty-five page brief in support of its motion for a TRO included over seven pages dedicated to its likelihood of success on its breach of contract claim, but fewer than three pages total regarding its likelihood of success on the merits of the other two claims.

Olson also argues that Plaintiff over litigated this case. He frames the case as one for a simple breach of contract that did not require the amount of discovery demanded by Plaintiffs. Again, some of Olson's criticisms are well-taken and others are less so.

Olson suggests that Plaintiff unnecessarily deposed two of Alpha's employees – Mike Wild and Matthew Marchand. Had Plaintiff only deposed Wild and Marchand to determine whether Olson breached his contract by soliciting former customers, Olson would have a point, as he admitted that he solicited them. However, Olson overstates the simplicity of the case and understates the value of Wild and Marchand's testimony to Plaintiff's breach of contract claim. As the Court has made clear in earlier opinions in this case, restrictive covenant cases are different from ordinary breach of contract cases. This is because Illinois public policy disfavors restrictive covenants as restraints on trade and therefore imposes conditions on the covenants' enforceability. In order to succeed, Plaintiff had the burden of establishing that the restrictive covenants related to a protectable interest. (Doc. 70 at 20-30). Two factors that courts commonly consider in making this determination are an employer's interest in the near permanence of its customers and the employer's interest in protecting the confidentiality of its information. (*See id.*). Plaintiff relied upon the testimony of both Wild and Marchand, each of whom work in the same industry, to establish that it had protectable interest. Therefore discovery related to them was not unreasonable.

However, it is possible – even likely – that some of the discovery that the parties conducted did not relate to the breach of contract claim. Plaintiff was actively requesting discovery and responding to discovery before it voluntarily dismissed its ITSA claim on March 2, 2015. And by the time that Plaintiff dismissed its tortious interference claim on March 13, 2015, its attorneys had spent a substantial amount of time preparing for trial, as well as conducting discovery

and deposing Alpha's employees. Although the Court understands that much of Plaintiff's discovery into Alpha's employees was necessary to pursue the breach of contract claim, it is inevitable that certain discovery would have been unnecessary had Plaintiff just brought the breach of contract claim. The same principal applies to the time that Plaintiff spent preparing to try the tortious interference claim.

In situations like this, where ambiguous time entries or redacted time entries impede meaningful judicial review, courts are left with some discretion on how to proceed. Here, Plaintiff has chosen to redact its records and has offered the Court the opportunity to review its records *in camera*. This is not an attractive way to resolve the problem. As one district court has recently reasoned, "to the extent that a fee-invoice claimant wishes a court to review an unredacted version of its attorneys' billing invoices for the purpose of judging the reasonableness of its fee request, it must as a matter of fundamental fairness, permit its opponent to review the unredacted version. . . ." *Nationwide Payment Solutions, LLC v. Plunkett*, 831 F. Supp. 2d 337, 338 (D. Me. 2011). The Court agrees that allowing it *ex parte* access to Plaintiff's invoices would deprive Olson of the opportunity to make arguments regarding the reasonableness of the time entries.

However, Olson's proposed solution – simply not allowing time for redacted entries and certain ambiguous block entries – is equally unappealing because it would deprive Plaintiff of the attorneys' fees to which it is contractually entitled. Instead, the Court will "reduce the proposed fee by a reasonable percentage." *See Harper v. City of Chicago Heights*, 223 F.3d 593, 605 (7th Cir. 2000).

Based on the nature of these concerns, the Court believes it would be unproductive to review Plaintiff's bills line-item by line-item. Unfortunately, the invoices are redacted or lack sufficient detail in such a way that attempting to categorize entries and then adjust accordingly would be as imprecise as simply reducing the total fee requested by a reasonable percentage would be. Plaintiff decided it would abandon its tortious interference claim on the morning of March 12, 2015. (*See* Dkt. at 3/12/15 Minute Entry). From March 12 until March 17, 2015, Plaintiff spent $27,162.50 on attorneys' fees. Therefore, until March 12, 2015, during which time at least one claim other than the breach of contract claim was pending, Plaintiff spent $107,928.50 on attorneys' fees. In light of the concerns raised above, the Court believes it is reasonable to reduce the pre-March 12, 2015 total by fifteen-percent, to $91,739.23.

In total, the Court reduces Plaintiff's fee request by $16,189.27. Having made these corrections to account for the possibility that Plaintiff's request included fees for time spent engaging in work unrelated to the breach of contract claim, the Court is satisfied that Plaintiff's fee-request is reasonable. The nature of the litigation itself controlled for any moral hazard on Plaintiff's part. This litigation was fast-paced; the parties made opening statements in the bench trial less than five weeks after Plaintiff filed its Verified Complaint. This compressed time schedule left little opportunity to engage in unnecessary legal work or run the clock and overbill. Moreover, Plaintiff's litigation strategy of moving to obtain a temporary restraining order and then obtain an injunction is consistent with the nature of the harm that it suffered or stood to suffer: losing business goodwill and customers because of its

prior employee's breach. Following the bench trial, the Court found that Plaintiff had an interest in those things, and the fee petition reflects that Plaintiff's attorneys pursued a litigation strategy meant to protect those interests.

Finally, Olson challenges the hourly rates that Adair and Benton charge. As a point of comparison, he asserts that his attorneys – Michael Lied and Timothy Groenwald of Howard & Howard Attorneys, PLLC in Peoria– only charge $390 per hour and $260 per hour, respectively. Plaintiff's attorneys, from Greensfelder, Hemker & Gale, P.C. in Chicago, bill at $505 per hour and $300 per hour, respectively.

An attorney's "actual billing rate for comparable work is presumptively appropriate to use as the market rate." *Mathur v. Bd. of Trustees of S. Ill. Univ.*, 317 F.3d 738, 743 (7th Cir. 2003). District courts should defer to higher hourly rates charged by out-of-town attorneys unless a "local attorney could do as well, and there is no other reason" to retain out-of-town attorneys. *Id*. at 744 (quoting *Chrapliwy v. Uniroyal, Inc.*, 670 F.2d 760, 768 (7th Cir. 1982)). In such a case, the judge has the discretion to adjust downward hourly rates to a level that a local attorney would have charged. *Id.*

The Court agrees with Olson that this is the sort of matter that a local attorney could have handled ably, and points out that Cumulus had well-respected local counsel. However, Plaintiff has provided evidence that it has a long-term relationship with Benton, who has represented it and its predecessor in employment disputes since 2007. (*See* Doc. 73 at 3). The fact that Benton is "familiar with Cumulus' business practices, the radio broadcasting industry, and

the job responsibilities of Cumulus' employees" provides a strong reason for Cumulus to retain Greensfelder in this matter rather than a local firm less familiar with its business. *Cf. Anderson v. AB Painting and Sandblasting, Inc.*, 578 F.3d 542, 544, 544 n.1 (7th Cir. 2009) (noting that lodestar awards can be adjusted upward based on the length of the professional relationship between an attorney and a client). This interest is especially salient in a case that needed to proceed quickly and efficiently.

The Court has no reason to doubt that Plaintiff's attorneys' hourly rates are reasonable for the Chicago market. Plaintiff has provided evidence that the rates its attorneys charge are the rates that it paid and that comparable clients pay on similar matters. (*See* Doc. 73 at 2-3). Where a Court must determine what is reasonable in the marketplace, this is enough. *In re Synthroid Mkt'g Litig.*, 264 F.3d 712, 722 (7th Cir. 2001).

Olson has not challenged the basis for any of the costs that Plaintiff seeks. Based on the Court's review of Plaintiff's costs, it determines that the $3,622.45 that it seeks is reasonable.

CONCLUSION

For the reasons set forth above, Cumulus's Motion for Attorneys' Fees and Costs (Doc. 72) is GRANTED IN PART and DENIED IN PART. Cumulus is awarded $118,901.73 in attorneys' fees and $3,622.45 in costs and other charges. CASE TERMINATED.

Entered this 26th day of May, 2015.

s/Joe B. McDade
JOE BILLY McDADE
United States Senior District Judge